DARNEZ PERKINS AND MICKIN PERKINS,

        Plaintiffs,

        v.

OFFICER JENNIFER O'SHAUGHNESSY,
OFFICER RAQUEL CASTANEDA, AND THE
CITY OF CHICAGO,

        Defendants.

No. 10 C 5574

Judge Thomas M. Durkin

## MEMORANDUM OPINION AND ORDER

Darnez and Mickin Perkins allege that Chicago Police Officers Raquel Castaneda and Jennifer O'Shaughnessy violated the Perkinses' Fourth Amendment rights by including false information in an affidavit in order to obtain a warrant to search the Perkinses' home. R. 1 (Count I). The Perkinses also allege that the manner in which Officer O'Shaughnessy searched their home violated the Fourth Amendment and that Officer O'Shaughnessy lacked probable cause to arrest them. R. 1 (Count II). The Perkinses also seek to have the City of Chicago pay for any damages Officers Castaneda or O'Shaughnessy are found to have caused pursuant to 745 ILCS 10/9-102. R. 1 (Count V).[1] Officer Castaneda and the City have moved for summary judgment, R. 62, and Officer O'Shaughnessy has as well. R. 67. For the following reasons, the City and Officer Castaneda's motion is denied; Officer

---

[1] The Court (Zagel, J.) previously dismissed the Perkinses' state law claims, Counts III and IV. *See* R. 23 (*Perkins v. O'Shaughnessy*, 2011 WL 579333 (N.D. Ill. Feb. 9, 2011)).

O'Shaughnessy's motion is denied with respect to the allegations in Count II pertaining to her arrest of the Perkinses, and granted with respect to Count I and the allegations in Count II pertaining to her search of the Perkinses' home.

## Background

On December 21, 2008 Officer Castaneda and her partner, Officer Yesenia Cortez, went to 4340 West Gladys Avenue in Chicago to investigate a complaint that two dogs had been left outside in the cold, as it was very cold that night. R. 85 ¶¶ 8, 10-11.[2] Officer Castaneda knocked on the front window of the house at 4340 West Gladys, and Mickin Perkins opened the door, R. 94 ¶ 5, although Officer Castaneda testified that she could not see who answered the door. R. 85 ¶ 12. Mickin Perkins told Officer Castaneda that the dogs had been outside for about 30 minutes to relieve themselves. R. 94 ¶ 5. Officer Castaneda called Mickin Perkins "a piece of shit," and Mickin Perkins then slammed the door shut. R. 94 ¶ 6.

Officers Castaneda and Cortez then went to the back of the house where they saw two dogs chained up. R. 85 ¶ 13. Officer Castaneda testified that both dogs were dirty and had heavy chains and padlocks around their necks, R. 85 ¶ 14, but Officer Castaneda did not see any marks or bruising resulting from the chains. R. 94 ¶ 4. There was no food or water outside with the dogs, R. 85 ¶ 14, but there were two igloo doghouses with blankets inside. R. 94 ¶ 3. Officer Castaneda also testified

---

[2] The parties dispute whether it was merely "cold" or "extremely cold." R. 85 ¶ 10. Records of the National Climatic Data Center, however, show that at Midway Airport on December 21, 2008 there was a low temperature of negative five degrees Fahrenheit, and on December 22, 2008 there was a low temperature of negative three degrees Fahrenheit. *See* http://www.ncdc.noaa.gov/cdo-web/datasets/GHCND/stations/GHCND:USW00014819/detail (last visited March 6, 2014).

that one of the dogs was very thin and that she could see the dog's rib cage, but the Perkinses dispute this. R. 85 ¶ 14.

Darnez Perkins came out on the back porch and identified himself as the dogs' owner. R. 85 ¶ 15; R. 94 ¶ 7. Darnez Perkins testified, "I showed [Officer Castaneda] my ID. I said, I work for the sheriff's department." R. 84-1 at 48:3-4. Yet Officer Castaneda disputes that Darnez Perkins identified himself by name. R. 94 ¶¶ 7-8.[3] The parties agree, however, that Darnez Perkins "flipped his badge," and that Officer Castaneda responded by saying, "I don't give a fuck about that." R. 94 ¶ 8. Officer Castaneda testified that she could see Darnez Perkins's face, but also that the "lighting was not very [good]. . . . [and that she] could see height [and] weight features." R. 85 ¶ 17.

Officers Castaneda and Cortez believed they had probable cause to arrest the dogs' owner for animal neglect or cruelty, and they called for a supervisor to come to the house. R. 85 ¶¶ 18-19. When Sergeant Keane arrived he went to the front door of the house and spoke with someone there for less than a minute. R. 85 ¶ 22. Darnez Perkins testified, "I told [Keane] where I worked," R. 84-1 at 56:15, and that he showed Keane his identification. R. 84-1 at 57:3-4.

---

[3] Officer Castaneda argues that the Perkinses have not presented any evidence that Darnez Perkins identified himself as "Darnez Perkins," R. 93 at 5, because Darnez Perkins did not specifically testify that "he identified himself by name." But Perkins did testify, "I showed [Officer Castaneda] my ID. I said, I work for the sheriff's department," R. 84-1 at 48:3-4, raising a factual issue as to his self-identification.

While still at the house, Officer Castaneda ran a search of 4340 West Gladys on the CLEAR system[4] and it returned a photo of Lennell Jones. R. 94 ¶ 12. Officer Castaneda determined that Lennell Jones was the man she spoke to about the dogs at the back porch of 4340 West Gladys. *Id.*[5] Officer Castaneda, Officer Cortez and Sergeant Keane left 4340 West Gladys without entering the house or arresting the Perkinses. Officers Castaneda and Cortez prepared a report of their investigation. R. 64-8.

Officer Castaneda testified that she later asked another police officer, Officer Josephine Christopher, to go to 4340 West Gladys to confirm the dog owner's name. R. 64-2 at 117:10-15. Officer Christopher testified that she spoke to a man at 4340 West Gladys who identified himself as "Derrick Johnson." R. 64-7 at 35:19-20. Darnez Perkins testified that Officer Christopher identified herself as "Officer Hines," R. 84-1 at 62:9-21, he identified himself as "Darnez Perkins," *id.* at 59:7-20, and he has never identified himself as "Derrick Johnson." *Id.* at 197:10-14. Officer Christopher testified that she never told anyone that the person she spoke to at 4340 West Gladys was Lennell Jones, and that she does not know whether the

---

[4] "CLEAR" is an acronym for "Citizen and Law Enforcement Analysis and Reporting," a database containing information about criminal offenders in Chicago. *See* https://portal.chicagopolice.org/portal/page/portal/ClearPath/Online%20Services /ICLEAR (last visited March 6, 2014).

[5] The Perkinses have filed with their papers on these motions a document titled Illinois Department of Correction Internet Inmate Status, dated May 20, 2011, that includes a photo of Lennell Jones. R. 84-7. The Perkinses allege that this is the photo that Officer Castaneda viewed on December 21, 2008, and argue that this photo does not resemble Darnez Perkins. R. 86 at 8. But the Perkinses have not provided any evidence demonstrating that this was the photo Officer Castaneda saw when she searched the CLEAR database. Thus, the Court will not consider this document.

person she spoke to was Lennell Jones. R. 84-8 at 52:16–53:2. Officer Christopher also testified that she cannot remember whether Officer Castaneda told her what Lennell Jones looked like. R. 94 ¶¶ 23-24.

Officer Castaneda then contacted the Animal Crimes Unit and Animal Care and Control, and delivered a copy of the case report. R. 85 ¶ 28. Officer Castaneda spoke with Officer O'Shaughnessy about the case. *Id.* ¶ 29. Officer O'Shaughnessy was a member of the Animal Crimes Team and was "an approved humane animal investigator." R. 75-6 ¶ 2. Officers Castaneda and O'Shaughnessy viewed Lennell Jones's photo on the CLEAR database, and Officer Castaneda told Officer O'Shaughnessy that this was the man who told her that he owned the dogs. R. 85 ¶ 29-30. Officer O'Shaughnessy testified that Officer Castaneda told her that Officer Christopher had visited 4340 West Gladys and encountered Lennell Jones. R. 84-9 at 39:6-19.

Officer O'Shaughnessy testified that Officer Castaneda was the only person she spoke with about the dogs at 4340 West Gladys, and specifically, that she never spoke with Officers Christopher or Cortez. R. 84-9 at 126:8-21. In addition to the information Officer O'Shaughnessy learned from Officer Castaneda, Officer O'Shaughnessy ran an "Accurint" report search of 4340 West Gladys, and the search returned the name "Mickin Jones." R. 85 ¶ 32. Officer O'Shaughnessy also reviewed Lennell Jones's criminal history and learned that he was a convicted felon. R. 88 ¶ 28.

On February 4, 2009, Officer O'Shaughnessy prepared a complaint for a warrant to search Lennell Jones and 4340 West Gladys based on probable cause that a felon was in possession of "an unspayed or unneutered dog," which is prohibited by criminal statute 720 ILCS 5/12-36. R. 84-11. The complaint did not concern animal abuse or cruelty, but stated in part:

> On 21 Dec 08 . . . . P.O. Castaneda #13253 and her partner P.O. Cortez #8181 . . . were dispatched to 4340 W. Gladys by O.E.M.C. to investigate two dogs left outside all day in the cold weather. . . . P.O. Castaneda #13253 then proceeded to the rear yard where she observed 2 dogs outside, each having small igloo houses. The female dog had a big heavy chain around her neck which was fastened to a 6 foot fence. At this time a male black (n.k.a. Lenell [sic] Jones) exited 4340 W. Gladys through the rear door and related to P.O. Castaneda #13253 that the 2 dogs were in fact his . . . . P.O. Castaneda #13253 was able to positively identify the male black that exited the rear of the residence as Lennell Jones by checking the Chicago Police Departments [sic] Data Warehouse.

> On 26 Dec 08, P.O. Christopher #5974 conducted a follow-up investigation . . . . During this follow-up investigation P.O. Christopher was met by Lennell Jones who used the alias Derrick Johnson.

> Lennell Jones was convicted of Aggravated Criminal Sexual Abuse/ Victim Under 13yoa on 12 Oct 95 under 95CR0446901 and sentenced to 5 years in IDOC. Lennel [sic] Jones was also convicted of PSMV on 17 Sept 01 under 00CR05355 and sentenced to 190 days in IDOC.

R. 84-11. Judge Michael Brown issued a warrant based on Officer O'Shaughnessy's complaint on January 2, 2009. *Id.*

Officer O'Shaughnessy was a member of the search team with ten other law enforcement officers who executed the warrant at 4340 West Gladys on January 2,

2009. R. 88 ¶ 35-37. At the time the search team entered the house, Mickin Perkins's cousin Reginald Day, and Day's friend Vincent were in the living room, and the Perkinses were upstairs. *Id.* ¶ 39-40. The Perkinses came downstairs, and they both became upset and shouted at the officers. *Id.* ¶¶ 41, 45. Mickin Perkins told the police that she and Darnez Perkins were Cook County Sheriffs. *Id.* ¶ 41. The police handcuffed the three men, but not Mickin Perkins. *Id.* ¶ 44. Darnez Perkins asked to see the warrant and when it was not immediately produced he told the officers, "Get the fuck out of my house." *Id.* ¶ 46. The police asked to see the Perkinses' identification, and when they confirmed that the Perkinses were Sheriff's deputies, the police removed their handcuffs. *Id.* ¶¶ 48-49. One of the members of the search team testified that he found several forms of "identification" for Mickin Perkins with "varied names," which caused suspicion of fraud. R. 75-5 at 38:19– 39:23.

In the course of executing the search warrant on 4340 West Gladys, Officer O'Shaughnessy searched the basement. She testified that immediately upon opening the door to the basement she smelled an "overpowering" odor of urine and feces, R. 88 ¶ 52, and that there were feces and urine on the basement floor. *Id.* ¶ 56. In the basement there was an adult female dog in a cage along with four puppies, and an adult male dog chained to a post. *Id.* ¶ 54-55. Officer O'Shaughnessy and one of the other search team members testified that the dogs were covered with urine and feces, suffered from mange, and were "skinny" and "emaciated." *Id.* ¶ 57-58. The Perkinses do not dispute that the dogs suffered from

mange, but they dispute that the dogs were covered with urine and feces, and allege that the urination and defecation on the floor occurred only after the police released the dogs. *Id.* ¶¶ 57-58. Officer O'Shaughnessy also testified that she saw blood on the adult male dog's tail, but Darnez Perkins alleges that neither this injury nor any other injury was present before the police arrived. *Id.* ¶ 59. Officer O'Shaughnessy admits that one of the officers executing the search warrant took slices of ham from the Perkinses' refrigerator and fed them to the dogs. R. 96 ¶ 39. The Perkinses allege that the dogs' injuries occurred from fighting over the ham. R. 89 at 14.

Officer O'Shaughnessy also took photos of the basement and the dogs, and she submitted a sworn declaration attaching and authenticating the photos. *See* R. 75-6; R. 75-7.[6] The Perkinses do not dispute Officer O'Shaughnessy's statement that some of the photos depict unhealed wounds on some of the dogs, or any of Officer O'Shaughnessy's descriptions of the photos in her declaration. R. 88 ¶ 61. The Court has reviewed these photos and finds that they depict unhealed wounds, R. 75-6 at FCRL 001047, 001050, 001052; R. 75-7 at FCRL 001055, 0010060; feces on the basement floor, R. 75-6 at FCRL 001046-47, 001049, 001052; and that the dogs' fur was very dirty, R. 75-7 at FCRL 001059, 001062. The Court cannot determine from the photos whether the dogs were covered in feces and urine. The Court does not agree with Officer O'Shaughnessy's statement that some of the photos depict

---

[6] The Perkinses object to these photos as "inadmissible hearsay, unsupported by a sworn statement." R. 88 ¶ 61. But Officer O'Shaughnessy did submit a sworn statement, R. 75-6, and the Perkinses have not explained their hearsay objection. Thus, the Court will consider these photos.

emaciated dogs. The Court does note that the photos depict one of the dogs chained to the wall, the other dogs in a cage, feces already on the floor, R. 75-6 at FCRL 001047, 001049, and injuries already present on the dog chained to the wall. R. 75-6 at FCRL 001047, 001050, 001052. The record does not reveal whether Officer O'Shaughnessy took the photos before or after the police fed ham to the dogs.

Based on the dogs' conditions, the Perkinses were arrested and charged with animal cruelty in violation of 510 ILCS 70/3.01, which provides, "No person or owner may beat, cruelly treat, torment, starve, overwork or otherwise abuse an animal." The dogs were taken to the animal care shelter. R. 88 ¶¶ 62, 69. Officer O'Shaughnessy signed the charging complaints. *See* R. 75-5 at 12-23.

## Legal Standard

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The Court considers the entire evidentiary record and must view all of the evidence and draw all reasonable inferences from that evidence in the light most favorable to the nonmovant. *Ball v. Kotter*, 723 F.3d 813, 821 (7th Cir. 2013). To defeat summary judgment, a nonmovant must produce more than "a mere scintilla of evidence" and come forward with "specific facts showing that there is a genuine issue for trial." *Harris N.A. v. Hershey*, 711 F.3d 794, 798 (7th Cir. 2013). Ultimately, summary judgment is warranted only if a reasonable jury could not

return a verdict for the nonmovant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

**Argument**

**I.      Officer Castaneda's Conduct**

    **A.      The Warrant**

The Perkinses allege that Officer Castaneda knew that Darnez Perkins was not Lennell Jones, and that Officer Castaneda violated the Fourth Amendment when she allegedly lied to Officer O'Shaughnessy about this fact before Officer O'Shaughnessy drafted her affidavit in support of her warrant request. "'A warrant request violates the Fourth Amendment if the requesting officer knowingly, intentionally, or with reckless disregard for the truth, makes false statements in requesting the warrant and the false statements were necessary to the determination that a warrant should issue.'" *Betker v. Gomez*, 692 F.3d 854, 860 (7th Cir. 2012) (quoting *Knox v. Smith*, 342 F.3d 651, 658 (7th Cir. 2003)); *see also Perlman v. City of Chicago*, 801 F.2d 262, 264 (7th Cir. 1986) (applying the standard of *Franks v. Delaware*, 438 U.S. 154 (1978), in the context of a civil action for damages). The Seventh Circuit has held "that a 'reckless disregard for the truth' can be shown by demonstrating that the officer 'entertained serious doubts as to the truth' of the statements, had 'obvious reasons to doubt [their] accuracy,' or failed to disclose facts that he or she 'knew would negate probable cause.'" *Betker*, 692 F.3d at 860 (quoting *Beauchamp v. City of Noblesville*, 320 F.3d 733, 743 (7th Cir. 2003)). There is a "presumption" that the affidavit was valid, and to survive summary

judgment the Perkinses must provide evidence to the contrary. *See Suarez v. Town of Ogden Dunes*, 581 F.3d 591, 596 (7th Cir. 2009).

Officer Castaneda argues that she "did not participate in preparing the search warrant and did not know about the search warrant." R. 93 at 4. In the context of a motion to suppress evidence in a criminal case pursuant to the rule of *Franks v. Delaware*, the Seventh Circuit has held that the inquiry "properly focuses" on the "states of mind of government agents from whom the affiant receives information." *United States v. Williams*, 718 F.3d 644, 652 (7th Cir. 2013); *see also United States v. Whitley*, 249 F.3d 614, 621 (7th Cir. 2001) ("Subsequent decisions have slightly expanded the *Franks* principle to include the state of mind not only of the affiant, but also of those governmental agents from whom the affiant received false information incorporated into the affidavit. In other words, the validity of the search is not saved if the governmental officer swearing to the affidavit has incorporated an intentional or reckless falsehood told to him by another governmental agent."). This principle is intended to prevent "police [from being] able to shield false information in affidavits from review simply by providing secondhand information to the drafting affiant." *Williams*, 718 F.3d at 652.

None of the parties address this authority. Moreover, the Court has not found any instance in this Circuit of a court holding that a government agent can be liable in the civil context for providing false information to another government agent who relied on that information to procure a warrant. But the Seventh Circuit has held that the *Franks* standard is applicable in the civil context. *See Perlman*, 801 F.2d at

264. The Seventh Circuit has also held that the *Franks* standard requires courts to examine the "states of mind of government agents from whom the affiant receives information." *Williams*, 718 F.3d at 652. Thus, despite the absence of authority *directly* on point, the Court sees no reason why Castaneda, a police officer who allegedly provided false information to another police officer, should not be civilly liable when a warrant is issued on the basis of that false information, as the Perkinses allege here.

Castaneda notes that the Seventh Circuit has held that "[a]n individual cannot be held liable in a § 1983 action unless he caused or participated in an alleged constitutional deprivation," *Jenkins v. Keating*, 147 F.3d 577, 583 (7th Cir. 1998), and Castaneda argues that she cannot be liable in this case because she did not participate in seeking the warrant. R. 63 at 6-8. Castaneda contends that her case is similar to that of the police officer in *Jenkins*, 147 F.3d at 583, who was found not liable for an unreasonable arrest because she did not actually participate in the suspect's arrest, but merely signed the criminal complaint against the suspect after the arrest. R. 63 at 7. Similarly, Castaneda cites *Montalvo v. Andreani*, 2011 WL 3704795, at *2 (N.D. Ill. Aug. 19, 2011), in which police officers who executed a search warrant were found not to be liable for constitutional violations in obtaining the search warrant. R. 63 at 7. But unlike the defendant-officers in both *Jenkins* and *Montalvo* who had no role in the decision to arrest or search a suspect, Officer Castaneda was both involved in the investigation that provided the factual basis for the warrant and served as a fact witness herself. She

may not have specifically "participated" in obtaining the warrant itself, but if the Perkinses' allegations are true, Castaneda "caused" a violation of the Perkinses' Fourth Amendment rights by recklessly disregarding the truth. *See Jenkins*, 147 F.3d at 583. At the very least, there is a question of material fact regarding whether Officer Castaneda knew or should have known that the information she gave to Officer O'Shaughnessy would be used as a basis for a warrant.

The relevant question then is whether the Perkinses have proffered sufficient evidence to raise a triable issue of fact regarding Officer Castaneda's truthfulness in reporting her investigation to Officer O'Shaughnessy. The parties dispute whether Darnez Perkins identified himself to Officer Castaneda and showed her his Sheriff deputy's badge. Officer Castaneda argues that the Perkinses have not presented any evidence that Darnez Perkins identified himself as "Darnez Perkins," R. 93 at 5, because Darnez Perkins did not specifically testify that "he identified himself by name." R. 94 ¶ 7. But Darnez Perkins testified, "I showed [Officer Castaneda] my ID. I said, I work for the sheriff's department." R. 84-1 at 48:3-4. This is enough evidence to create a question of fact as to whether Darnez Perkins identified himself to Officer Castaneda by name, especially since Officer Castaneda admits that Darnez Perkins "flipped his badge." R. 94 ¶ 8.

Furthermore, Officer Castaneda exhibited some doubt that the man she encountered at 4340 West Gladys was Lennell Jones since she asked Officer Christopher to attempt to verify that information. The parties dispute whether Darnez Perkins accurately identified himself to Officer Christopher when she

visited 4340 West Gladys, and Officer Christopher testified that she never told anyone that the person she met at 4340 West Gladys was Lennell Jones. Yet, Officer O'Shaughnessy testified that Officer Castaneda told her that Officer Christopher had also encountered Lennell Jones. This evidence is sufficient to raise a question of fact regarding Officer Castaneda's representations to Officer O'Shaughnessy regarding the dog owner's identity.

The crime alleged in the warrant was that a convicted felon was in possession of certain prohibited dogs. The question of whether the man Officer Castaneda encountered at 4340 West Gladys was Lennell Jones, a convicted felon, or someone else was critical to one of the necessary elements of the suspected crime. If Darnez Perkins actually accurately identified himself to Officer Castaneda or Officer Christopher, then probable cause would not have existed for a warrant based on suspicion of a crime involving a convicted felon. The Perkinses have proffered sufficient evidence to show that a genuine factual dispute exists regarding whether Officer Castaneda was truthful.[7]

---

[7] The parties argue over whether Officer Castaneda had a responsibility to engage in further investigation to confirm the identity of the person she encountered at 4340 West Gladys. *See* R. 86 at 9; R. 93 at 5-6. This is beside the point. The CLEAR report that Lennell Jones lived at 4340 West Gladys and the presence of the dogs on the property would be sufficient to establish probable cause of a violation of 720 ILCS 5/12-36. But if Darnez Perkins identified himself to Officers Castaneda or Christopher as he claims, then probable cause to perform a search of the house based on the presence of a felon in possession of an unspayed or unneutered dog did not exist. In that case, further investigation would have been required. Thus, the primary question is whether Darnez Perkins accurately identified himself, and the parties dispute this question.

## B. Qualified Immunity

Officer Castaneda also argues that her actions are protected by qualified immunity. R. 63 at 8. "Qualified immunity shields a government official from liability for civil damages unless his or her conduct violates a clearly established principle or constitutional right of which a reasonable person would have known at the time." *Betker*, 692 F.3d at 860. "An officer who knowingly or recklessly submitted an affidavit containing false statements may still get qualified immunity if he can establish that he had an objectively reasonable basis for believing the facts in the affidavit were sufficient to establish probable cause." *Id.* "But qualified immunity does not extend where an officer knowingly or recklessly made false statements and no accurate information sufficient to constitute probable cause attended the false statements." *Id.* (internal quotation marks omitted). "Although the privilege of qualified immunity is a defense, the plaintiff bears the burden of defeating it." *Id.*

Here, there is a genuine dispute as to the material fact of whether the warrant was based on facts Officer Castaneda knew to be false or recklessly believed to be true. And the Seventh Circuit has held that "there are plenty" of cases clearly establishing that a police officer may not recklessly disregard the truth in characterizing her investigation. *Betker*, 692 F.3d at 864. Therefore, Officer Castaneda is not entitled to qualified immunity in this case.

## II.    Officer O'Shaughnessy's Conduct

### A.    The Warrant

The Perkinses cite the same evidence the Court reviewed with respect to Officer Castaneda to argue that there is a genuine question of material fact as to whether Officer O'Shaughnessy knew that her affidavit contained false statements or was reckless in believing that it was truthful. R. 89 at 5-7. The Perkinses also argue that O'Shaughnessy's failure to verify all of the information she learned from Officer Castaneda establishes that Officer O'Shaughnessy was reckless. R. 89 at 7-11.

The parties, however, do not dispute that Officer O'Shaughnessy received all the information contained in her affidavit from Officer Castaneda. An officer may reasonably rely on information provided by other officers in assessing whether probable cause for an arrest exists. *See Duran v. Sirgedas*, 240 Fed. Appx. 104, 114, 2007 WL 1259059, at *8 (7th Cir. May 1, 2007) (citing *Martinez v. Simonetti*, 202 F.3d 625, 634 (2d Cir. 2000)); *Rebolar v. City of Chicago*, 897 F. Supp. 2d 723, 735 (N.D. Ill. 2012); *Fitzgerald v. Santoro*, 842 F. Supp. 2d 1064, 1068 (N.D. Ill. 2012). Since Officer O'Shaughnessy was entitled to rely on Officer Castaneda's representations about the evidence she had discovered, Officer O'Shaughnessy cannot be liable for recklessly including false information in her affidavit.

Moreover, even if it was not reasonable for Officer O'Shaughnessy to rely on Officer Castaneda's representations, this was a "reasonable mistake" such that Officer O'Shaughnessy is entitled to qualified immunity on this claim. *See Gutierrez*

*v. Kermon*, 722 F.3d 1003, 1008 (7th Cir. 2013); *see also Saucier v. Katz*, 533 U.S. 194, 205 (2001) ("The concern of the immunity inquiry is to acknowledge that reasonable mistakes can be made as to the legal constraints on particular police conduct."). The information Officer O'Shaughnessy received from Officer Castaneda was not on its face so unreasonable or improbable that she should have been on notice that it was false or was reckless in believing it to be true.

Accordingly, Count I alleging that O'Shaughnessy knowingly or recklessly disregarded the truth in preparing the affidavit for the warrant must fail.

**B.     The Search**

The Perkinses argue that once the Perkinses had identified themselves as Sheriff's deputies and none of the people present in 4340 West Gladys had been identified as Lennell Jones, "probable cause to continue the search had begun to dissipate," such that the eventual search of the basement violated the Fourth Amendment. R. 89 at 12. This argument, however, ignores the fact that the warrant was not only to search Lennell Jones, but also to search the premises of 4340 West Gladys itself. R. 84-11. Just because the officers conducting the search were not able to immediately determine that Lennell Jones was present in the house, that does not mean that he had never been in the house, that he was not hiding in the house, or that the officers would not find evidence in the house that Lennell Jones was in possession of certain dogs in violation of 720 ILCS 5/12-36. "A lawful search of fixed premises generally extends to the entire area in which the object of the search may be found and is not limited by the possibility that separate acts of entry or opening

may be required to complete the search." *United States v. Ross*, 456 U.S. 798, 821-22 (1982); *accord United States v. Mancari*, 463 F.3d 590, 596 (7th Cir. 2006). Moreover, "[i]n executing a search warrant officers may take reasonable action to secure the premises and to ensure their own safety and the efficacy of the search." *Los Angeles County v. Rettele*, 550 U.S. 609, 614 (2007); *accord United States v. Norris*, 640 F.3d 295, 303 (7th Cir. 2011). Thus, it was reasonable and not a violation of the Fourth Amendment for Officer O'Shaughnessy and the other officers to search the basement of 4340 West Gladys.

Additionally, even if Officer O'Shaughnessy did not have a legal basis to search the basement, this was a "reasonable mistake" such that Officer O'Shaughnessy is entitled to qualified immunity on this claim. *See Gutierrez*, 722 F.3d at 1008.

Accordingly, the portion of Count II alleging that O'Shaughnessy illegally searched the Perkinses' home is dismissed.

### C.    The Arrest

Officer O'Shaughnessy contends that "[i]t is undisputed that the Perkinses' dogs were covered in urine and feces, had open wounds, appeared skinny, suffered from mange, and that one puppy was deformed and in bad condition when Officer O'Shaughnessy and the Animal Crimes Team found them." R. 95 at 14. The Perkinses do not dispute that feces were present in the basement and some of the dogs were injured. But the Perkinses do dispute that the dogs were covered in feces and urine and were malnourished. Furthermore, although the Perkinses admit that

the dogs were injured and there were feces and urine on the basement floor, the Perkinses also testified that these conditions were not present before the police arrived. *See* R. 88 ¶¶ 56-59. They contend that any injuries and the presence of feces and urine on the floor were the result of the police releasing the dogs from confinement and attempting to feed them. *See* R. 89 at 13-15.

Officer O'Shaughnessy argues that the Perkinses have not presented any evidence of their alternative explanations for the dogs' conditions, and notes that the Perkinses "admit that they were not in the basement" to witness the officers' actions. R. 95 at 14. But Officer O'Shaughnessy does not argue that the Perkinses do not have personal knowledge of the condition of the dogs prior to the officers' arrival. The Perkinses' testimony that the dogs were not in the condition depicted in the photos Officer O'Shaughnessy took prior to the arrival of the police is evidence of what condition Officer O'Shaughnessy and the other officers found the dogs to be in when they searched the basement. *See Hill v. Tangherlini*, 724 F.3d 965, 967 (7th Cir. 2013) ("deposition testimony" is "perfectly admissible evidence through which a party tries to present its side of the story at summary judgment").

Moreover, there is no non-testimonial evidence in the record to contradict the Perkinses' testimony. The photos Officer O'Shaughnessy took are not so clear that a reasonable juror could only conclude that the feces on the floor and the dirt and injuries on the dogs occurred prior to the police arriving at the house. Rather, the photos are sufficiently ambiguous that a reasonable juror could conclude that these conditions occurred only shortly before the photos were taken, and thus, could have

been caused by the police. Additionally, despite the fact that the dogs were impounded and presumably examined upon impoundment, there is no report in the record indicating the age or extent of the dogs' injuries, or confirming that the dogs were malnourished. Absent evidence confirming that Officer O'Shaughnessy's description of the dogs' condition reflects a condition that existed prior to the arrival of the police at the Perkinses' house, whether the dogs were in a condition to create probable cause of criminal animal abuse or neglect remains a question of fact for a jury.

Officer O'Shaughnessy argues that she is entitled to qualified immunity because even if the condition the dogs were in was insufficient evidence to establish probable cause, a "reasonable officer could have mistakenly believed that probable cause existed." R. 68 at 18. But the relevant question is not whether Officer O'Shaughnessy was mistaken in believing that injured dogs covered in feces and urine was a sufficient basis for probable cause, but whether Officer O'Shaughnessy and her fellow officers caused those conditions. If Officer O'Shaughnessy and her fellow officers caused the dogs to be in the condition she alleged in her complaint, then there was no probable cause for arrest. As the Court discussed previously, the Perkinses have presented sufficient evidence to make this a triable question of fact. Thus, Officer O'Shaughnessy is not entitled to qualified immunity.

## Conclusion

For the foregoing reasons, the City and Officer Castaneda's motion, R. 62, is denied; Officer O'Shaughnessy's motion, R. 67, is denied with respect to the

allegations in Count II pertaining to her arrest of the Perkinses, and granted with respect to Count I and the allegations in Count II pertaining to her search of the Perkinses' home. A status hearing is scheduled for March 19, 2014 to discuss whether Defendants plan to appeal the Court's denials of qualified immunity or to schedule a prompt trial date.

ENTERED:

_____
Honorable Thomas M. Durkin
United States District Judge

Dated: March 7, 2014